52 F.3d 324
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 The BUDD COMPANY, Plaintiff-Appellee, Cross-Appellant,
v.
ADMIRAL INSURANCE COMPANY, Defendant-Appellant, Cross-Appellee,
Royal Indemnity Company; New England Reinsurance
Corporation; Sentry Insurance Corporation Northbrook Excess
& Surplus Insurance Company; American Centennial Insurance
Company; First State Insurance Company, Defendants, Cross-Appellees,
James SEDGWICK f/k/a Fred S. James & Company of New York,
Inc., Defendant and Third Party Plaintiff, Cross-Appellee,
v.
MONTGOMERY & COLLINS Third Party Defendant.
 Nos. 93-2423, 93-2473.
 United States Court of Appeals, Sixth Circuit.
 April 6, 1995.
 
 Before: KENNEDY and NORRIS, Circuit Judges; BECKWITH, District Judge.*
 PER CURIAM.
 
 
 1
 This diversity action arises from three written contracts for excess liability insurance entered into between plaintiff The Budd Company ("Budd") and defendant Admiral Insurance Company ("Admiral") for the policy years beginning November 1, 1981, through October 31, 1984 ("1981-1984 policies").[1] Budd obtained a declaratory judgment against Admiral and the first layer of insurance carriers excess to Admiral providing that the Admiral policies covered defense costs in addition to the stated limit of liability and that there was no aggregate limit of liability except for product liability claims. Admiral appeals, arguing that the policies were ambiguous and that the District Court should have construed them using the parties' course of conduct. Admiral also asserts that the policies should have been reformed to reflect this course of conduct. Finally, Admiral contends the District Court erred in awarding Budd pre-complaint interest. We affirm the judgment of the District Court except with respect to the award of pre-complaint interest.
 
 I.
 
 2
 The material facts are not in dispute. Budd's insurance program is a multi-tiered program consisting of a self-insurance program ("SIP") for its first layer of losses, a subsequent layer of excess umbrella liability insurance provided by Admiral, and several succeeding layers of excess insurance coverage provided by various insurers excess to Admiral (the "excess carriers").[2] From 1977 through 1984 Admiral issued Budd umbrella liability insurance policies immediately excess to Budd's self-insurance amount. The 1981-1984 policies provided Budd with $1 million of excess umbrella liability coverage. The insurance policies excess to the Admiral policies follow form with the Admiral policies.
 
 A. Defense Costs
 
 3
 From 1977 through October 31, 1981, the Admiral policy stated that it did not cover defense costs. However, in 1978, Admiral changed its policy by adding Endorsement No. 7 so that the policy would cover defense costs as part of the applicable cost of liability.[3] Endorsement No. 7 provides as follows:
 
 
 4
 It is understood and agreed to the extent the Primary Underlying Coverages are broader than those afforded by this policy, the other terms and conditions not withstanding, this policy shall apply as Excess Insurance and shall follow the terms and conditions of such primary underlying coverages.
 
 
 5
 (Joint App. 360). The "primary underlying coverages" discussed in Endorsement No. 7 refer to Budd's SIP. Prior to 1981, Budd's SIP provided broader coverage with respect to defense costs than the Admiral policies because the applicable limit of liability in the self-insurance program included these costs.[4] Thus, between 1978 and 1981, under Endorsement No. 7, Admiral was required to pay Budd's costs of defense prior to 1981 and these defense costs were paid as part of the $1 million limit of liability.
 
 
 6
 In 1981, Admiral revised its umbrella policies, including the policy it issued to Budd. Budd was not consulted before the revisions were made, although Admiral notified its various brokers, including Budd's broker, Fred S. James & Co of New York, Inc. ("James"), of the change. The notification consisted of a brochure entitled "A Major Change! We Have Improved Our Umbrella Policy." (Joint App. 436). A copy of Admiral's standard umbrella policy was attached to the flyer. This policy, which was used between 1981 and 1984, provided that Admiral would pay defense costs in addition to the limits of liability coverage. Endorsement No. 7 was also retained in the 1981-84 policies. James received this flyer but did not discuss its contents with Budd.
 
 
 7
 Between 1981 and 1988, no claims, judgments, or settlements reached the $1 million limit of the Admiral policy. In 1988, the claims and defense costs covered under the 1982-83 and 1983-84 policies surpassed $1 million for each policy year and a dispute arose between Admiral and Budd concerning the amount of coverage. Admiral refused to reimburse Budd for defense costs in addition to the liability limits of the policies. Admiral argued that by virtue of the "follow form" language in Endorsement No. 7 defense costs eroded the $1 million limit of the policies just as damage awards and settlements eroded the limit. The excess carriers refused to pay anything until Admiral exhausted its coverage and contended that Admiral must pay $1 million excluding defense costs before they become liable.
 
 B. Limits of Liability
 
 8
 The parties also disagree as to whether Admiral's $1 million aggregate liability limit for product liability claims (products hazard and completed operations claims) applies to general liability claims (personal injury, property damage and advertising injury claims) as well. The "Declaration Sheet" in the 1981-84 policies provides for $1 million coverage arising out of one occurrence of personal injury, property damage, or advertising injury. (Joint App. 329). The policy jacket provides that there is no limit to the number of occurrences covered, except that the amount paid for product liability claims cannot exceed $1 million. (Joint App. 331).
 
 
 9
 Admiral admits that the 1981-84 policy provisions establish that there no longer is any aggregate limit of liability except for product liability. However, Admiral contends that the liberalization clause in Endorsement No. 7 supersedes these provisions. Admiral argues that Endorsement No. 7's "follow form" provisions mandate application of the Budd SIP's single personal injury/property damage overall aggregate limit, rather than the separate general liability and product liability limits in the printed policy.[5]
 
 C. District Court Proceedings
 
 10
 Budd filed suit against Admiral, seeking a declaratory judgment that Admiral had a duty to pay defense costs in addition to Admiral's limits of liability.[6] Budd also sought a declaratory judgment that the limit of liability on the 1981-84 Admiral policies is $1,000,000 per occurrence with no aggregate limit on general liability claims. Admiral counterclaimed, seeking reformation of the contract and contending that Budd had been unjustly enriched.[7]
 
 
 11
 On January 8, 1992, the District Court granted summary judgment in favor of Budd. The court held that the Admiral policy need not follow form with the SIP despite Endorsement No. 7. As a result, the court held that Budd's defense costs did not erode Admiral's aggregate liability limit for the 1981 through 1984 policy years. The court also held that there was no aggregate limit of liability on the 1981-84 policies except for product liability claims. (Joint App. 103-04). On September 16, 1993, the court denied Admiral's motion for summary judgment on its counterclaim for reformation and unjust enrichment.
 
 
 12
 On October 4, 1993, the court entered an order granting declaratory relief in favor of Budd and held that Budd was entitled to a monetary judgment for unreimbursed defense costs and loss payments for the 1982 and 1983 policy years. The court also awarded Budd precomplaint interest and prejudgment interest running from the time the complaint was filed. (Joint App. 131). Admiral now appeals.[8]
 
 II.
 
 13
 Admiral contends that Endorsement No. 7 was ambiguous and so the District Court erred by not looking to the course of dealing between the parties. We review a district court's entry of a declaratory judgment de novo. Kelley v. E.I. DuPont De Nemours & Co., 17 F.3d 836, 844 (6th Cir.1994).
 
 
 14
 Whether a contract's terms are ambiguous is a question of law for the court which is subject to de novo review. Boyer v. Douglas Components Corp., 986 F.2d 999, 1003 (6th Cir.1993). Tennessee Consolidated Coal Co. v. United Mine Workers, 416 F.2d 1192, 1198 (6th Cir.1969), cert. denied, 397 U.S. 964 (1970). Once the court has determined that the terms of a contract are plain and unambiguous, the court should not rewrite the contract "under the guise of interpretation," but should enforce the contract terms as written. Upjohn Co. v. New Hampshire Ins. Co., 476 N.W.2d 392, 397 (Mich.1991); Auto-Owners Ins. Co. v. Churchman, 489 N.W.2d 431, 434 (Mich.1992) (court will not create ambiguity in insurance policy where none exists). Where a contract is unambiguous, the terms of the contract are conclusive and extrinsic evidence concerning the parties' intentions is inadmissible. Moore v. Kimball, 289 N.W. 213, 215 (Mich.1939); Haywood v. Fowler, 475 N.W.2d 458, 461 (Mich.App.1991), appeal denied, 479 N.W.2d 693 (Mich.1992)
 
 
 15
 We do not find the terms of Endorsement No. 7 to be ambiguous. Endorsement No. 7 states that if Budd's SIP provides broader coverage than the Admiral policy, Admiral will provide broader coverage as well. It is plain from this language that Endorsement No. 7 was intended to liberalize the Admiral policy provisions and that the Admiral policy would follow form only where the Budd SIP provided broader coverage. The District Court noted, and we agree, that the meaning of the phrase "liberalization clause" belies Admiral's argument that we should construe Endorsement No. 7 to narrow the overall aggregate liability limit and the defense costs coverage provided by Admiral's policy.
 
 
 16
 Admiral, relying on Peterson v. Zurich Ins. Co., 225 N.W.2d 776 (Mich.App.1975), argues that a rider prevails if it conflicts with the printed form policy. However, Peterson states that all parts of the policy should be "harmonized and given effect, if it can be consistently done." Id. at 779 (citation omitted). A rider controls only if it is "inconsistent and irreconcilable" with the printed clause. Id. (citation omitted). The interpretation advanced by Admiral would create a policy which was internally contradictory. It would be inconsistent for the 1981 policy to be "improved" to cover defense costs only to have them be excluded by Endorsement No. 7. The plain terms of the endorsement state that it only applies if Budd's coverage is broader, allowing the endorsement to be reconciled with the printed policy language.
 
 
 17
 Because we find the policy to be unambiguous, we cannot consider extrinsic evidence concerning the course of conduct between the parties or their intentions concerning the policy. Moore, 289 N.W. at 215. The District Court therefore did not err in following the plain terms of the policy and holding that Admiral was responsible for defense costs in addition to its limits of liability and that the aggregate limit of liability applies only to product liability claims.
 
 III.
 
 18
 Admiral further contends that the District Court should have reformed the policy on the grounds of mutual mistake because Budd and Admiral believed that there was an aggregate limit of liability for all claims and believed that defense expenses would erode the liability limits. In Michigan, courts will reform insurance contracts where there has been a mutual mistake of fact. Goldman v. Century Ins. Co., 93 N.W.2d 240, 242 (Mich.1958). However, reformation is inappropriate where third parties relied to their detriment on the written agreement. American Employers Ins. Co. v. St. Paul Fire and Marine Ins. Co., 594 F.2d 973, 978 (4th Cir.1979); 76 C.J.S. Reformation of Instruments Sec. 43 (1994). (Reformation will not be granted where it will unsettle rights).
 
 
 19
 The action for reformation was brought by Admiral against Budd, but did not include the excess carriers. The District Court found that at least some of the excess carriers relied on the revised terms of the 1981-84 policies. (Joint App. 31). Raymond Lewis, representative for First State, New England and Royal provided an affidavit stating that it was routine policy for these companies to review the terms of the lead umbrella (Admiral) policy to confirm its terms and conditions and that the excess policies were based on these terms. (Joint App. 657-58). Furthermore, for all the 1981-84 policy years there were additional layers of coverage above the second layer of coverage provided by the excess insurers who are involved in this action. These additional layers involve carriers who were not joined in the suit and who could be materially affected by the reformation. The District Court thus did not err in rejecting Admiral's argument that the contract should be reformed.[9]
 
 IV.
 
 20
 Admiral argues that the District Court erred in awarding Budd pre-complaint interest. On August 26, 1993, the court determined that the claims were not reasonably in dispute and ordered that interest be paid. (Joint App. 1200-01). On October 4, 1993, the court entered a final judgment stating:
 
 
 21
 With respect to interest, Plaintiff shall be entitled to post-complaint/pre-judgment interest from the date when losses accrued. As for post-judgment interest, Plaintiff shall be entitled to post-judgment interest for losses from August 26, 1993 forward. Plaintiff shall also be entitled to pre-complaint interest as provided in M.C.L. Sec. 500.2006(4).
 
 
 22
 (Joint App. 134).
 
 
 23
 Michigan law provides for pre-complaint interest of twelve percent where benefits are not paid on a timely basis to an insured. MICH.COMP.LAWS ANN. Sec. 500.2006 (West 1993). Because Sec. 500.2006 is a statute having a punitive purpose, malice or fraud is required before an insurer is subject to liability. Commercial Union Insurance Co. v. Liberty Mut. Ins. Co., 393 N.W.2d 161, 164 n. 5 (Mich.1986). "The 12 per cent interest rate is a penalty to be assessed only against insurers who procrastinate in paying meritorious claims." O.J. Enterprises, Inc. v. Insurance Co. of North America, 292 N.W.2d 207, 208 (Mich.App.1980).
 
 
 24
 The District Court found that the claims were not reasonably in dispute, given the change in language in the 1981-84 policies. (Joint App. 1300-01). Whether a claim is reasonably in dispute is a matter for the court. All American Life & Casualty Co. v. Oceanic Trade Alliance Council Int'l Inc., 756 F.2d 474, 482 (6th Cir.), cert. denied, 474 U.S. 819 (1985). We review mixed questions of fact and law de novo. Paul Revere Life Ins. Co. v. Brock, 28 F.3d 551, 553 (6th Cir.1994).
 
 
 25
 The parties' course of conduct shows that there was no dispute between them until the complaint was filed. Both parties acted as if the policies had not been changed in 1981. Admiral and Budd had even prepared a joint complaint to file against all the second layer carriers until Budd discovered the revised policy jacket. For this reason, the dispute did not begin until the complaint was filed. Admiral should not be subject to a penalty for failure to pay benefits during the time period where Budd had not asserted its right to the benefits.[10]
 
 V.
 
 26
 For the foregoing reasons, the judgment of the District Court is AFFIRMED in all respects except for the court's award of pre-complaint interest. The District Court's award of pre-complaint interest is REVERSED and REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Sandra S. Beckwith, United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 The parties agree that Michigan law applies
 
 
 [2]
 The excess carriers involved in this action are First State Insurance Company ("First State"), Northbrook Excess and Surplus, Inc. ("Northbrook"), Sentry Insurance Company ("Sentry"), New England Reinsurance Corporation ("New England") and Royal Indemnity Company ("Royal")
 
 
 [3]
 Endorsement No. 7 is sometimes referred to by the parties as the "Liberalization Clause."
 
 
 [4]
 Budd's self-insurance program prior to 1981 provided that:
 The "Self-Insurance" Program will pay as part of the applicable limit of liability:
 (a) All expenses incurred and all costs taxed against The Budd Company or other insured in any suit defended by The Budd Company or other insured and all interest on the entire amount of any judgment therein which accrues after entry of the judgment.... (Joint App. 86).
 
 
 [5]
 Budd's SIP provided for $1 million in coverage for each occurrence for product liability and general liability. The 1981-82 policy had an overall aggregate limit of $2 million. The 1982-82 policy had an overall aggregate limit of $2.15 million. (Joint App. 92)
 
 
 [6]
 Budd's complaint also included the alternative counts of reformation, breach of contract, and negligence against Admiral
 
 
 [7]
 Budd also brought negligence, misrepresentation and breach of contract claims against James in Counts V through VII of its complaint. The court denied summary judgment on these claims on September 18, 1993, finding that there were material issues of fact. The court noted that Admiral and the excess carriers wished to appeal and that whether Budd had a right to recover from James turned on this appeal. The court, pursuant to FED.R.CIV.P. 54(b), severed the claims against James, entered final judgment against Admiral and the excess carriers, and certified that they could immediately appeal
 
 
 [8]
 Budd cross-appeals, arguing that the District Court erred in entering judgment on Budd's alternative claims of relief against Admiral. Budd's purpose in bringing this cross-appeal was to preserve these arguments in the event that we reversed the District Court's declaratory ruling in favor of Budd. Because we affirm the District Court, we need not address this cross-appeal
 
 
 [9]
 Admiral argues that the District Court erred in excluding under FED.R.EVID. 408 two letters written by James and Budd and offered by Admiral in support of Admiral's reformation claim. It is not necessary for us to review this ruling because Admiral is not entitled to reformation on the grounds already discussed
 
 
 [10]
 Budd argues that because Admiral had agreed to indemnify the excess insurers in case the action for reformation failed, Admiral admitted its liability and should be required to pay interest. However, the indemnification agreement also shows that Budd and Admiral were working together to seek the reformation, further evidence that Budd did not believe it had a claim at the time. (Joint App. 707-13)